## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STEPHANIE J. MAXWELL,

                    Plaintiff,

v.

ST. FRANCIS HEALTH CENTER, CITY
OF TOPEKA – WATER DEPARTMENT,
H. KENT HOLLINS P.A., and MR. H.
KENT HOLLINS,

                    Defendants.

Case No.: 5:17-cv-04014-SAC-JPO

### PLAINTIFF'S RESPONSE TO DEFENDANT ST. FRANCIS
### HEALTH CENTER'S MOTION TO DISMISS

Plaintiff Stephanie Maxwell ("Plaintiff" or "Ms. Maxwell"), by undersigned counsel,

responds in opposition to Defendant St. Francis Health Center's ("St. Francis" or "Defendant")

Motion to Dismiss First Amended Complaint (ECF No. 29).  For her opposition Ms. Maxwell

states:

### I.    Statement of the Nature of the Matter before the Court

This is a case about a decorated veteran, wronged by the careless and unlawful activity of

a notorious debt collector, which was compounded by the irresponsibly negligent behavior of her

creditors.  The debt collector defendants maintain their actions were authorized by law, but that

assertion forsakes reality.  The City of Topeka and St. Francis Health Center maintain that they

cannot be held liable for the conduct of their attorneys, but that assertion ignores long-standing

principles of agency.  Plaintiff submits that this case revolves around three key sets of facts.

*First*, the assertion that the affidavits were not false is patently inaccurate.  The Hollins

Defendants are a debt collection machine and their compliance with the law is limited to only the

1

absolute minimum necessary to ensure a continued supply of default judgments against consumers for the benefit of the creditors they represent.  Here, the Hollins Defendants failed to meet even that low bar when they unreasonably relied on DMDC searches to determine Plaintiff's military status.  *Second*, the Hollins Defendants' reliance on DMDC searches was deficient because they were previously informed of Plaintiff's military status, and despite this knowledge, failed to conduct a more thorough investigation into Plaintiff's military status, as required by statute.  *Third*, the City of Topeka and St. Francis feed the Hollins Defendants debt collection machine, never pausing even to question why a simple collection lawsuit was continued out *for years*, and never asking why, after all that time, the Hollins Defendants belatedly secured the respective default judgments.

Plaintiff is an honorably serving officer in the United States Air Force who brings suit against the City of Topeka, St. Francis Health Center, and their attorneys for violations of the federal Servicemembers Civil Relief Act, 50 U.S.C. § 501 *et seq.* ("SCRA"), the Kansas Consumer Protection Act, K.S.A. § 50-623 *et seq.* ("KCPA"), and for several state common law claims.  Plaintiff primarily complains that Defendant negligently supervised the conduct of its attorneys, allowing for collection activity which cumulated in an unlawful taking of a default judgment and subsequent garnishment, resulting in the conversion of Plaintiff's military pay, with associated mental anguish and emotional distress.  Defendant now moves this Court for dismissal, chiefly arguing that it cannot be held liable for the actions of its attorney.  On the contrary, Defendant is both vicariously liable for the actions of its agent, and directly liable for its failure to supervise and control the unlawful collection actions taken against Plaintiff.  Because Plaintiff's Amended Complaint plausibly pleads facts sufficient to survive threshold dismissal, this Court must deny Defendant's motion to dismiss.

## II.    Statement of Facts

Plaintiff is formerly a Kansas resident, a consumer as that term is defined by the FDCPA and the KCPA, and a servicemember as that term is defined in the SCRA.  Plaintiff has been on active duty as either an enlisted airman or an officer continuously since April 2009.  Defendant is a Kansas municipality and governmental entity.  In 2009 Defendant filed suit against Plaintiff seeking to collect a debt.   To facilitate the collection, Defendant retained the services of Defendant H. Kent Hollins and his law office, located in Topeka.  At the time those lawsuits were filed, Plaintiff was on active duty and no longer resided in the State of Kansas.  Defendants then attempted to continue and stay the case for six years until it was eventually dismissed on May 10, 2016 due to improper service.  During the course of the lawsuit, Defendant St. Francis, by and through its agents the Hollins Defendants, caused to be filed two false affidavits stating that the Hollins Defendants investigated Plaintiff's military status and found that Plaintiff was not on active duty.  Defendants subsequently entered a default judgment against Plaintiff on February 24, 2015, while she was on active duty.   After entry of the default judgment, Defendants took a garnishment against her, draining her accounts of funds and causing additional charges to be incurred.  In May 2016, Judge Wilson of the District Court of Shawnee County, Kansas granted Plaintiff's motion to set aside/vacate the default judgment, finding that Plaintiff was never properly served in the state court collection lawsuits.

Plaintiff filed suit on February 6, 2017 against Defendants H. Kent Hollins, Mr. H. Kent Hollins, and St. Francis Health Center.  In Plaintiff's First Amended Complaint, filed on April 21, 2017, Defendant City of Topeka was added after Defendant City of Topeka failed to respond to Plaintiff's December 14, 2016 Notice of Legal Claim, mailed in accordance with K.S.A. § 12-105b(d).

### III.    Argument

#### a.  Standard

In the Tenth Circuit, "granting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." Dias v. Cty. of Denver, 567 F.3d 1169, 1178 (10th Cir. 2009).

At the Rule 12(b)(6) stage, all facts alleged by the Plaintiffs "must be taken as true[,]" and "[t]he court construes any reasonable inferences from these facts in favor of the plaintiff." Hopkins v. Bd. of Wilson Cty., No. 15-2072-CM, 2016 WL 4479080, at *1 (D. Kan. Aug. 25, 2016) (citations omitted). Under Iqbal/Twombly, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Id. (quoting Twombly). As a result, "the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven." Weckhorst v. Kansas State Univ., --- F. Supp. 3d ---, No. 16-CV-2255-JAR-GEB, 2017 WL 980456, at *1 (D. Kan. Mar. 14, 2017) (citing Iqbal and Twombly).

Ultimately, "[t]he issue in reviewing the sufficiency of a complaint is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support her claims." Parke v. Cowley Cty., No. 15-1372-JTM, 2017 WL 840952, at *2 (D. Kan. Mar. 3, 2017) (quoting Ruiz v. McDonnell, 299 F.3d 1173, 1181 (10th Cir. 2002)); see also Radermacher v. Bitron/Elbi Int'l S.P.A., No. 16-01051-EFM-KGG, 2016 WL 4919841, at *6 (D. Kan. Sept. 15, 2016) (explaining that even though the facts alleged in the complaint likely would be disproven after discovery occurred, the Court was still bound to deny the motion to dismiss under the Iqbal standard).

"To survive a motion to dismiss, a complaint must contain enough factual matter to state a plausible claim."  Donner v. Nicklaus, 778 F.3d 857, 864 (10th Cir. 2015). Plausibility requires more than labels and conclusions, but the Complaint needs only enough "factual matter, accepted as true, to 'state a claim that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### b. The City of Topeka is both vicariously liable, and directly liable for both its conduct, and the conduct of its attorneys

The threshold matter for this Court's consideration is whether Defendant can be held liable for the actions it took in attempting to collect a debt from Plaintiff.  Defendant avers that this entire case "is based on vicarious liability for action of its attorney." ECF No. 30 at 4.  In support of this argument Defendant St. Francis relies primarily on the Illinois Supreme Court case of *Horwitz v. Holabird & Root*, 816 N.E.2d 272 (Ill. 2004).

In *Horwitz*[1] an architectural business retained the services of a law firm to collect a debt incurred by an Illinois real estate investment corporation.  *Id.* at 274.  During the course of litigation, the law firm disclosed confidential information of the judgment debtor in letters printed on the law firm's letterhead and identifying the architectural business that the law firm represented.  *Id.*  In response, the judgment debtor filed suit for defamation and tortious interference with a business relationship against the architectural business and its attorneys.  *Id.* In deciding the issue of "whether, and if so, to what extent, clients may be held vicariously liable for the intentional torts of their attorneys" the Illinois Supreme Court affirmed the general rule of agency that "principals are liable for their agents' conduct within the scope and in the service of

---

[1] It should also be noted that the Horwitz case involved a business to business dispute; this case, however, involves a dispute between a consumer (which is protected by several state and federal statutes), Plaintiff Stephanie Maxwell, and the debt collector defendants. Therefore, it is uncertain as to whether or not this case, which involves a business to business lawsuit for tortuous interference and defamation, is instructive at all.

the agency." *Id.* at 283.  The Illinois Supreme Court specifically declined to draw a distinction between "a normal agent and an attorney." *Id.* (internal quotation marks removed).

That holding is important because *Horwitz* does <u>not</u> stand for the proposition that a client can never be held liable for the conduct of its attorneys.  Rather, *Horwitz* merely holds that, for purposes of vicarious liability, "an attorney can be both an independent contractor and an agent, but regarding particular conduct is either one or the other, not both."  Essentially then, Horwitz sets up the general rule that a client is not normally liable for the misconduct of its attorney because "an attorney usually pursues a client's legal rights without specific direction from the client, using independent professional judgment to determine the manner and form of work." *Id.* at 279.  However, this general rule is subject to a number of exceptions.

> [W]here a plaintiff seeks to hold a client vicariously liable for the attorney's allegedly intentional tortious conduct, a plaintiff must prove facts demonstrating either that the client specifically directed, controlled, or authorized the attorney's precise method of performing the work or that the client subsequently ratified acts performed in the exercise of the attorney's independent judgment. If there is no evidence that the client directed, controlled, authorized, or ratified the attorney's allegedly tortious conduct, no vicarious liability can attach.

*Grant-Hall v. Cavalry Portfolio Servs., LLC*, 856 F. Supp. 2d 929, 941 (N.D. Ill. 2012).

The Northern District of Illinois case of *Grant-Hall v. Cavalry Portfolio Services, LLC*, 856 F. Supp. 2d 929 (N.D. Ill. 2012), a lawsuit also dealing with legally defective collection activity, is instructive regarding the exceptions applicable to the case at bar.  In *Grant-Hall*, a debt collection agency retained the services of a small number of Illinois law firms to collect debts, primarily through the filing of state court collection actions. *Id.* at 933.  The collection lawsuits did not, apparently, evidence the collection agency's possession of documentation showing ownership of the debt, in accordance with Illinois state law. *Id.*  In response to the

lawsuits filed by the debt collection agency, by its attorneys, various debtors filed lawsuits against the agency and its attorneys for violations of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692, Illinois's Collection Agency Act, 225 ILCS 425/8b, and Illinois's Consumer Fraud Act, 815 ILCS 505/1.  *Id.* at 935.  In finding that a client can be liable for its attorney's misconduct the Northern District of Illinois affirmed the exception that "[a] client also may be liable if it ratifies the attorney's unauthorized act, as "ratification of an unauthorized act is tantamount to an original authorization and confirms what was originally unauthorized."  *Id.* at 941.

> A client ratifies the actions of his attorney by not repudiating the acts once he has knowledge of them, or by accepting the benefits of those acts. Ratification need not be express; it may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction.

*Id.* (quoting *Kulchawik v. Durabla Mfg. Co.*, 371 Ill.App.3d 964, 309 Ill.Dec. 503, 864 N.E.2d 744, 750 (2007)).

This definition of ratification mirrors long-established Kansas law.  "A ratification on the part of the principal or master of the act of his agent or servant may consist in receiving and retaining the benefits thereof." *Will v. Hughes*, 172 Kan. 45, 55, 238 P.2d 478, 485 (1951); *Flitch v. Boyle*, 149 Kan. 834, 89 P.2d 909, 909 (1939) ("Where a principal expressly or impliedly elects to ratify an unauthorized act, he must, so far as it is entire, ratify the whole of it, and will not be permitted to accept its benefits and reject its burdens.").  Further "[i]t is a fundamental rule that, if the principal elects to ratify any part of the unauthorized act, he must ratify the whole of it." *Guarantee Title & Trust Co. v. Reinhart*, 130 Kan. 798, 288 P. 549, 551 (1930).

Saliently, this case revolves around the improper taking of a default judgment by the Hollins Defendants, to the benefit of Defendant.  This benefit was retained until the Shawnee

County District Court vacated the underlying judgment.  The retention of a benefit is sufficient to infer that the responsible conduct was ratified by Defendant under Kansas law.  *Will v. Hughes*, 172 Kan. 45, 55, 238 P.2d 478, 485 (1951).

Additionally, as reasoned by the *Grant-Hill* court, Defendant has a better than normal relationship with its attorney, given that Defendant repeatedly retains the Hollins Defendants' legal services.   From this relationship, we may infer a greater than normal level of communication, and therefore knowledge regarding the progress of the various collection lawsuits filed by the Hollins Defendants on behalf of Defendant.  The salient question which rises from these inferences is when, if at all, Defendant withdraws its accounts from the Hollins Defendants' purview.  The Hollins Defendants continued out the state court collection actions for the better part of six years—a year longer than the statute of limitations in Kansas.   Did Defendant ever even question the Hollins Defendants regarding the status of the collection lawsuit filed against Ms. Maxwell—a lawsuit which inexplicably had gone on for nearly six year?  Alternatively, if Defendant had been made aware of Ms. Maxwell's military status, then taking a default judgment against her with that knowledge makes Plaintiff's case.

Consequently, this case encompasses two of the exceptions to the general rule that a client is not liable for the conduct of its attorney, and Defendant's motion to dismiss, to the extent that it is premised on this theory, should be denied.  The aforementioned reasoning of *Grant-Hill*'s applies well to this matter.  The Hollins Defendants are the chosen attorneys of St. Francis for purposes of collecting on defaulted debt.  This is not the case of a one-off relationship between an unsophisticated client with their attorney— St. Francis is a sophisticated entity that has used the Hollins Defendants for dozens of lawsuits seeking to collect debt, so like the collection agency defendant in *Grant-Hill* it is "fair to infer that [St. Francis], as a . . . volume

purchaser of legal services, has much greater control over its attorneys than does the typical client." *Grant-Hill*, 856 F. Supp. 2d at 942.   Consequently, both theories of liability advanced by Plaintiff (that Defendant is either vicariously liable for its attorneys' actions via ratification or control, or directly liable for its own failure to supervise its attorneys) should survive dismissal.

Finally, and as an aside, Defendant forgets that in the debt collection context the principal is frequently held liable for the agents' actions—even when that agent in an attorney.   "Some courts have held clients vicariously liable for their lawyers' violations of the FDCPA." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 600, 130 S. Ct. 1605, 1622, 176 L. Ed. 2d 519 (2010); *Schutz v. Arrow Fin. Servs., LLC*, 465 F.Supp.2d 872, 875–76 (N.D. Ill. 2006) ("Many courts have recognized that a company may be held vicariously liable [under the FDCPA] for the collection activities of attorneys working on its behalf."); *see also Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507, 1516 (9th Cir. 1994).   Consequently, the mere fact that St. Francis was represented by counsel, and that it was counsel's unlawful collection activity which gave rise to this lawsuit, should not shield Defendant St. Francis from liability.   This threshold issue should be resolved in Plaintiff's favor.

### c.   Plaintiff states a claim for relief under the SCRA

"The Servicemembers Civil Relief Act is part of a long record of congressional concern for the domestic affairs of those in military service." *Gordon v. Pete's Auto Service of Denbigh, Inc.*, 637 F.3d 454, 457 (4th Cir. 2011). "[T]he SCRA—like its predecessors—must be read with an eye friendly to those who dropped their affairs to answer their country's call." *Id.* at 458.   The SCRA "always to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation." *Boone v. Lightner*, 319 U.S. 561, 565, 63 S. Ct. 1223 (1943).

**i.   Plaintiff's SCRA claim survives dismissal knowledge is not a requirement for civil liability, and the affidavits filed by Defendant's agents and on Defendant's behalf are false**

Defendant asserts that Plaintiff alleges no facts sufficient to establish that the affidavits filed in support of the state court collection actions were knowingly false.[2]   ECF No. 33 at 13. Defendants' argument is a nonstarter.   Defendant contends that only knowingly false affidavits impose liability under the SCRA; but that's a half-truth.   Defendant is correct in that knowledge of the affidavits falsity is an element of criminal liability—but the same standard is not necessary for the civil SCRA plaintiff.   *See United States v. B.C. Enterprises, Inc.*, 67 F. Supp. 2d 650, 662 (E.D. Va. 2009) ("Presumably, since knowledge is the mens rea required for criminal liability, such mens rea is not required to establish civil liability.") (citing *United States v. Consolidation Coal Co.*, 504 F.2d 1330, 1334 (6th Cir.1974) ("Obviously, it was not intended that such a violation as would give rise to a civil penalty should be alternatively a criminal offense.")); *Gordon v. Pete's Auto Service of Denbigh, Inc.*, 837 F. Supp. 2d 581, 585 (E.D. Va. 2011) ("[Section 307 of the SCRA] is a strict liability statute; it does not require proof of any mens rea to establish civil liability").

Regardless of whether the Hollins Defendants acted with actual knowledge in filing the false affidavits, the affidavits themselves are uncontrovertibly false in two, significant ways. First, the affidavit is false to the extent that it purports to state a fact about Ms. Maxwell not being on active duty in the U.S. Military.   Plaintiff is and has been on active duty since 2009. Second, the affidavit is false to the extent that it states that the Hollins Defendants caused to occur a careful investigation into Ms. Maxwell's military status.   By the Hollins Defendant's own admission, they did no more than refer to a DMDC web-search.   *See* <u>ECF No. 27 at 2</u>.   The

---

[2] Defendant also argues that it cannot be held liable under this section because it, in its own name, did not file any affidavits.   For reasons explained above, Defendant is liable for the actions of its attorney, particularly in the debt collection context, even if Defendant was not acting on its own behalf.

DMDC searches that Defendants rely on actually caution against using their system as the sole means of verifying a debtor's military status, and strongly encourage the debt collector Defendants to conduct a more thorough investigation by contacting the service branch of the debtor *when the debt collector has reason to know that the debtor is or was in the military*.  That was not done in this case, so it is difficult to see how a "careful" investigation could have been conducted.

### ii. To the extent this Court determines knowledge to be a factor for purposes of imposing civil liability, the Hollins Defendants had the requisite level of knowledge of the affidavits' falsity

Defendant argues that the Hollins Defendants "did all they could do to determine whether Plaintiff was active-duty" and then submit as evidence of their due diligence, the Department of Defense Manpower Data Center searches they ran in the course of their collection efforts. Perhaps ironically, the Manpower Data Center searches submitted by Hollins Defendants actually belie the point the Defendants are attempting to make.  The DMDC search results attached to the Hollins Defendants' first motion to dismiss clearly state, in addition to disclaiming "a small error rate":

> In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting the person's Service . . . If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you.

ECF No. 12-2 at 26.  Defendants do not claim that they contacted the U.S. Air Force to further verify the service status of the Plaintiff, even though Defendants were told by the Plaintiff herself that she was employed by the military and the Hollins Defendants had more than two years'

worth of DMDC searches confirming the active duty status of the Plaintiff.  Instead the Hollins

Defendants appear to ignore the language on the very DMDC searches they rely on to support

the irrational position that their conduct was authorized by law.  Paradoxically Defendant's

contend that a "careful" investigation into Plaintiff's military status was made.  ECF No. 27-2 at

1.  Defendants further state that they had not "received notice of induction or notice to report for

active service."  *Id.*  The contention that a careful investigation was done is patently false, and

Defendants should not be accorded the benefit of the doubt in light of their reliance on DMDC

searches which disclaim accuracy on its face, and instead, encourages users to undertake more

thorough methods of investigation.

As stated by the Ninth Circuit "[I]t is logical for debt collectors—repeat players likely to

be acquainted with the legal standards governing their industry—to bear the brunt of the risk. As

we have oft repeated, it does not seem unfair to require that one who deliberately goes perilously

close to an area of proscribed conduct shall take the risk that he may cross the line*." Clark v.

Capital Credit & Collection Services, Inc.*, 460 F.3d 1162, 1171–72 (9th Cir. 2006) (quoting

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 393, 85 S. Ct. 1035 (1965)) (internal quotation

marks removed).

The Hollins Defendants are the "repeat players" referenced by the Ninth Circuit.  They

are in the best position to know the statutorily prescribed limitations on their collection activities,

and most importantly: this law is intended to protect individuals in the same position of Plaintiff.

Defendants are prominent debt collectors, well aware of the laws which govern their behavior.

To place the burden on Plaintiff to police Defendants conduct (to the extent that Plaintiff should

have been required to assist Defendant's collection efforts) is contrary to congressional intent

and to the plain language of the statute.  Defendants recklessly bypassed their statutory

obligations, and seek to hide behind the DMDC searches—which only represent the minimum amount of effort necessary to identify the military status of a debtor, and which also disclaim complete accuracy while strongly encouraged follow-on investigations when the Defendants are aware that the debtor may be military.  Defendants had knowledge of Plaintiff's military service, both from their own DMDC searches and from a telephone conversation with Plaintiff, and failed to further investigate Plaintiff's military status.

This level of recklessness, from the party most familiar with the consumer protection laws which control its collection processes, evidences that the Hollins Defendants "deliberately goes perilously close to an area of proscribed conduct."  *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 393, 85 S. Ct. 1035 (1965).  Plaintiff has properly pled facts sufficient to show that Defendants were previously aware of her active duty military status[3], but as noted above, knowledge of their affidavits falsity is not an element for civil liability under the SCRA.  To the extent that actual knowledge might be an element, Plaintiff has plead that Defendants knew of her active duty status, and that is a fact which must be taken as true for purposes of this motion.  It thus makes sense that they be punished for going over the line.  Thus, Plaintiff's SCRA claim must survive threshold dismissal.[4]

---

[3] Defendant St. Francis takes issue with Plaintiff's reference to a January 2015 telephone call supporting the position that the Hollins Defendants were informed by Plaintiff of her military status.  ECF No. 30 at 12 fn.10.  Specifically, Defendant argues that because Ms. Maxwell did not, apparently, use the term "active-duty military" to describe her employment, that the Hollins Defendants could not have been put on notice of Plaintiff's military service.  This argument is a nonstarter.  Parties are expected to use "more tools beyond mere reason and common sense . . . to attribute ordinary definitions to terms utilized."  *McKellips v. Kumho Tire Co.*, No. 13-cv-2393-JTM-TJJ, 2015 U.S. Dist. LEXIS 49390, at *71 n.136 (D. Kan. Apr. 15, 2015).  The SCRA and the FDCPA place the burden of compliance on the debt collector, here the Hollins Defendants, not on the debtor.  It was not for Ms. Maxwell to tell the Hollins Defendants of her military status, it was for the Hollins Defendants to determine as part of a careful investigation.  Ms. Maxwell put the Hollins Defendants on notice, which went ignored.  At the least, this is an issue that should go to a jury to determine whether Defendants were put on sufficient notice to infer actual knowledge as to Plaintiff's military status as a result of the January 2015 telephone call.

[4] Defendant St. Francis also argues that because it did not take part in garnishing Plaintiff's account, that any allegation of garnishment supporting Plaintiff's SCRA is misplaced and supports dismissal.  This is

### d. Plaintiff states a claim for relief under the KCPA

"The KCPA expressly provides that it is to be construed liberally in order to protect consumers from suppliers who commit deceptive and unconscionable practices." *Via Christi Regional Medical Center, Inc. v. Reed*, 298 Kan. 503, 519, 314 P.3d 852 (2013) (citing *Unruh v. Purina Mills*, 289 Kan. 1185, 1207, 221 P.3d 1130 (2009)). "Whether a deceptive act or practice has occurred under the [KCPA] is not a question of law for the court, but rather a question of fact for the jury to decide. It is susceptible to summary judgment in a defendant's favor only if unsupported by evidence." *Id.* at 520 (quoting *Manley v. Wichita Business College*, 237 Kan. 427, Syl. ¶ 2, 701 P.2d 893 (1985)); *Bomhoff v. Nelnet Loan Services, Inc.*, 279 Kan. 415, Syl. ¶ 4, 109 P.3d 1241 (2005). "The issue of whether an act is unconscionable under the KCPA is a question of law . . . [and] ultimately depends upon the facts of the case." *Dodson v. U-Needa Self Storage, LLC*, 32 Kan.App.2d 1213, 1218, 96 P.3d 667 (2004). Additionally, "[t]o recover damages for either type of violation under the KCPA, a party must establish that he or she was 'aggrieved' by the violation of the Act." *Via Christi Regional Medical Center, Inc. v. Reed*, 298 Kan. 503, 519, 314 P.3d 852, 863 (2013) (citing *Finstad v. Washburn University*, 252 Kan. 465, 472, 845 P.2d 685 (1993)). When adjudicating whether or not an individual was "aggrieved" the Kansas Supreme Court previously held that: "A party is aggrieved whose legal right is invaded by an act complained of or whose pecuniary interest is directly affected by the order. The terms refers to substantial grievance, a denial of some property right., or the imposition upon a party of some burden or obligation." *Petition of Kansas* City, 190 Kan. 308, 314, 374 P.2d 35 (1962).

"[T]he Kansas Supreme Court has stated that the KCPA should be liberally construed to promote the public policies of streamlining the law of consumer transactions and protecting

---

not the case. Plaintiff specifically alleges a wrongful garnishment claim against the Hollins Defendants and the City of Topeka only. Plaintiff's SCRA claim against St. Francis is based solely on the filing of false affidavits and the unlawful taking of a default judgment against Plaintiff.

consumers from unscrupulous suppliers." *Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1244 (D. Kan. 2007) (citing *Williamson v. Amrani*, 283 Kan. 227, 234, 152 P.3d 60, 67 (2007)). Defendants do not contend that the KCPA does not apply to them, nor do Defendants dispute that Plaintiff is a consumer, and that the relevant transactions are "consumer transactions" subject to the protections of the KCPA.  Instead, Defendant asserts that Plaintiff has pled no set of facts which would suggest a deceptive or unconscionable violation of the law.   For the following reasons, Plaintiff's amended complaint properly pleads two violations of the KCPA.

### i. Plaintiff has adequately alleged facts sufficient to state a claim for a deceptive practice in violation of the KCPA

A supplier violates the KCPA's prohibition of deceptive trade practices if it makes use of exaggeration, falsehood, innuendo, or ambiguity as to a material fact; or fails to state such a material fact, or conceals, suppresses, of omits said material fact.  Essentially, misrepresenting or omitting a material fact to a consumer is the *sine qua non* of an unlawful and deceptive practice offensive to the KCPA.  *See York v. Intrust Bank, N.A.*, 265 Kan. 271, 291 (1998).  In Kansas, a "willful" act is one "performed with a designed purpose or intent on the part of a person to do wrong or to cause injury to another."  *Heckard v. Martin*, 25 Kan. App. 2d 162, 165 (1998).

Here, as alleged in the amended complaint, the Hollins Defendants misrepresented Ms. Maxwell's military status, thereby subjecting to a default judgment that should not have been entered.  Defendants further misrepresented the extent of their investigation into Ms. Maxwell's military service, asserting that a "careful" investigation was conducted when, in fact, the Hollins Defendants carelessly relied on the deficient DMDC searches.  Further, Ms. Maxwell has alleged that this behavior caused her harm, making her an "aggrieved" consumer for purposes of KCPA statutory damages.

To the extent that Defendants may argue that they made no representation to the

consumer herself, or that the only communication alleged in the amended complaint is a telephone conversation absent misrepresentation, that assertion is without merit.  The Hollins Defendants' affidavits were filed in the state court collection lawsuit, intended to be seen by both the Court and Ms. Maxwell.  Were Ms. Maxwell actually served with process, and had she been aware of the lawsuit, she would have seen the Hollins Defendants' misrepresentation of her military status.  That Ms. Maxwell was not served with process, making her unable to timely rectify the misrepresentation, further evidences the deceptive nature of this conduct.  Because Ms. Maxwell has properly pleaded facts sufficient to state a claim for violations of the KCPA's prohibition on deceptive practices, Ms. Maxwell's claim for violations of K.S.A. § 50-626 should survive dismissal.

### ii. Plaintiff has adequately alleged facts sufficient to state a claim for an unconscionable practice in violation of the KCPA

The Kansas Supreme Court has held that K.S.A. § 50-627 applies to "unconscionable advertising techniques, unconscionable contract terms, and unconscionable debt collection practices."  *State ex rel. Miller v. Midwest Service Bureau of Topeka, Inc.*, 229 Kan. 322, 324, 623 P.2d 1343 (1981).  "The KCPA prohibits unconscionable acts and practices—not simply unconscionable outcomes."  *Via Christi Regional Medical Center, Inc. v. Reed*, 298 Kan. 503, 524, 314 P.3d 852 (2013).  "While the KCPA does not define 'unconscionability,' it does set forth the following statutory examples of unconscionable acts: . . . [t]he supplier took advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor."  *State ex rel. Stovall v. DVM Enterprises, Inc.*, 275 Kan. 243, 250, 62 P.3d 653 (2003).

Plaintiff submits that Defendant's conduct is brought within the KCPA's definition of

"unconscionability" as it relates to the first statutory example of unconscionability.  *See* K.S.A. § 50-627(b)(1).  While that definition mostly lists examples of a consumer's physical inability to protect their interests, the legislature's intent is clearly related to the protection of a consumer's interests, when that consumer is, through circumstances outside that consumer's control, unable to protect their own interests.  Likewise here, Plaintiff was unable to protect her own interests by virtue of Plaintiff's military service.  Naturally, the burden is on Plaintiff to show that Defendant was aware of Plaintiff's military status—but for reasons that are explained in greater detail in the section dealing with negligent supervision, Defendant remained willfully blind as to the protected status of its customer.

Importantly, and Plaintiff cannot stress this enough, Defendant is not an unsophisticated purchaser of legal services.  Defendant has its own legal department, staffed with its own attorneys, all of whom could have (or should have) been in communication with the Hollins Defendants to ensure that the Hollins Defendants were representing the Defendant's interests in a lawful manner.  To put it simply, Defendant has layers of protection, ensuring the compliance with state and local laws in a variety of areas—why did those layers fail to protect the interests of one of Defendant's customers, a military veteran and consumer?

Like Via Christi's failure to comply with the requirements of a Kansas statute making its lien ineffective in the case of *Via Christi Regional Medical Center, Inc. v. Reed*, 298 Kan. 503, 314 P.3d 852 (2013)., Defendants' failure to comply with the requirements of the SCRA are an unconscionable practice under the KCPA.  See Via Christi, 298 Kan. at 529.  Also like Via Christi, Plaintiff has pled facts raising the inference that Defendant should have known that its conduct was running close to a statutorily proscribed area of conduct—if only Defendants were not so negligent in their supervision of the Hollins Defendants so as to take advantage of Ms.

Maxwell's inability to properly protect her interests as a consumer and servicemember.

In an effort to complexify these proceedings, Defendant largely relies on the 2014 case of *Briscoe v. Cohen, McNeile & Pappas, P.C.*, No. 14-cv-2146-DDC-KGG, 2014 WL 4954600 (D. Kan. Oct. 1, 2014), and indeed, in one reduces the similarities in this case to simply: default → judgment → garnishment → return of money; then at first glance it might seem like *Briscoe* should be an instructive case. However, reducing this matter to a formula that fits *Briscoe* prejudices Ms. Maxwell and misrepresents the facts of this case. *Briscoe* is good law insofar as that case stands for the proposition that securing a default judgment and garnishing a consumer, even in the absence of service, is not an unfair or deceptive collection activity. But Ms. Maxwell is not complaining that Defendants simply failed to serve her before they took judgment and sought to garish her. Instead, Mr. Maxwell complains that Defendants failed, with notice of their statutory duty, to comply with the requirements of a federal law, designed to prevent this exact type of injury. Ms. Maxwell complains that Defendants misrepresented their compliance with the law by filing false affidavits in an effort to unlawfully secure a default judgment for purposes of garnishing her account. Simply, it's not the default judgment that causes Ms. Maxwell's injuries—it's Defendants misrepresenting a fact in order to secure that default judgment. Briscoe is thus inapposite.

Finally, Plaintiff submits that a violation of a federal consumer protection statute can constitute a per se violation of the KCPA. *See In re Nave*, 303 B.R. 223, 228 (Bankr. D. Kan. 2003). Additionally, Plaintiff has pled that her legal rights were invaded by an act of Defendants, thereby making her "aggrieved" for purposes of the KCPA. *Petition of Kansas* City, 190 Kan. at 314. Thus, Plaintiff has pled facts sufficient to state claims for both unconscionable and deceptive violations of the KCPA, to wit: Plaintiff has pled that she is a consumer, that

Defendant is a supplier, and that in connection with a consumer transaction Defendant engaged in collection activities offensive to the KCPA.  Because Plaintiff has stated a claim for violations of the SCRA, a statute designed to protect servicemembers and the FDCPA as to the Hollins Defendants, Plaintiff has as a consequence, stated a claim for relief under the KCPA.

### e.   Plaintiff states a claim for negligent supervision

"Negligent supervision, hiring, or retention is a recognized cause of action under Kansas law; its focus is upon the actions of someone other than the person whose negligence caused the injury." *Marquis v. State Farm Fire and Casualty Co.*, 265 Kan. 317, 329, 961 P.2d 1213, 1222 (1998).  "Kansas law recognizes negligent supervision as a separate and distinct theory in addition to theories of negligent hiring and negligent retention. Negligent supervision includes not only the failure to supervise but also the failure to control persons with whom the defendant has a special relationship, including the defendant's employees or persons with dangerous propensities." *Wayman v. Accor North America, Inc.*, 45 Kan.App.2d 526, 545, 251 P.3d 640 (2011) (quoting *Marquis*, 265 Kan. at 331).  "Negligent supervision claims can be based upon a defendant's failure to supervise or control persons with whom the defendant has a special relationship, even if the person is not an employee of the defendant." *Miller v. Dillard's, Inc.*, 166 F. Supp. 2d 1326, 1334 (D. Kan. 2001).

As explained above, Defendant has focused the vicarious liability aspect of Plaintiff's claims; however, Defendant misses that Plaintiff has also alleged that Defendant is directly liable for its failure to supervise and control the actions of its attorney.  Defendant argues that a litigate "owes no duty to its adversary in litigation" and relies on the venerable Kansas Supreme Court case of *Nelson v. Miller*, 227 Kan. 271, 607 P.2d 438 (1980).  Defendant's reliance on *Miller* is misplaced.  Defendant correctly quotes that a *lawyer* has no duty to an adverse client, but

Defendant points to no authority suggesting that such a rule be extended to the *adverse party itself*.  Importantly, Plaintiff is not suggesting that the Hollins Defendants owed her any duty other than those imposed by statute; however, that is not-so with the City of Topeka.  The policy arguments advanced by Defendants do not hold water.  As explained *supra*, policy weighs in favor of Plaintiff, particularly in cases where, as here, the adverse party is a volume purchaser of legal services and enjoys a long-term special relationship with its attorney.  *See Grant-Hall v. Cavalry Portfolio Servs., LLC*, 856 F. Supp. 2d 929, 941 (N.D. Ill. 2012).

Here, Plaintiff has alleged that Defendant's agents twice filed false affidavits in their attempts to collect a debt for the benefit of Defendant, and that a default judgment was entered against Plaintiff and in favor of Defendant.  Plaintiff has plausibly alleged facts showing that Defendant's failure to supervise its agents caused the aforementioned harms, and thus Plaintiff states a claim for negligent supervision.  Consequently, this Court should decline to dismiss count five.

Importantly, and Plaintiff cannot stress this enough, Defendant is not an unsophisticated purchaser of legal services.  Defendant has its own legal department, staffed with its own attorneys, all of whom could have (or should have) been in communication with the Hollins Defendants to ensure that the Hollins Defendants were representing the Defendant's interests in a lawful manner.  To put it simply, Defendant has layers of protection, ensuring the compliance with state and local laws in a variety of areas—why did those layers fail to protect the interests of one of Defendant's customers, a military veteran and consumer?

Finally, Defendants have consistently maintained they had no duty to supervise their attorney, and that their attorney was not an "employee" for purposes of an agency analysis, but rather an "independent contractor" for purposes of vicarious liability.  If that is Defendant's

20

argument, then Plaintiff is entitled to discovery of the Hollins Defendants' retainer agreement executed with the City of Topeka and St. Francis so that Plaintiff may determine, at the appropriate stage, the full extent of the relationship between the Hollins Defendants, St. Francis, and the City of Topeka.   Regardless, at this early stage of litigation Plaintiff has pled sufficient facts which, if taken as true, state a claim for negligent supervision.   This claim should survive dismissal.

### f.   Plaintiff states a claim for common law intrusion upon seclusion

"[T]o prevail upon such a claim it is necessary to establish two factors: First, something in the nature of an intentional interference in the solitude or seclusion of a person's physical being, or prying into his private affairs or concerns, and second, that the intrusion would be highly offensive to a reasonable person."  *Moore v. R.Z. Sims Chevrolet-Subaru, Inc.*, 241 Kan. 542, 547, 738 P.2d 852, 856–57 (1987).   "There is no liability for knocking at the [Plaintiff's] door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt.   It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the [Plaintiff], that becomes a substantial burden to his existence, that his privacy is invaded."  *Rush v. Portfolio Recovery Associates, LLC*, 977 F. Supp. 2d 414, 434 (D.N.J. 2013).

Taking the two elements in reverse order, the "highly offensive" element is satisfied in this case.   Plaintiff is afforded the benefit of state and federal consumer protection laws during the pendency of her time in uniform.   Defendant's skirting those protections in its overzealous attempts to collect trivial debts should not be awarded with immunity from liability.   This is in keeping with the guidance of the Kansas. Supreme Court, which notes that in debtor-creditor relationships there are typically additionally elements for a debtor to satisfy to sustain an

invasion of privacy claim.  *Cf., Moore v. R.Z. Sims Chevrolet-Subaru, Inc.*, 241 Kan. 542, 549,

738 P.2d 852, 857 (1987) ("[t]he issue has not been squarely presented in the debtor-creditor

situation . . . [w]hen one accepts credit, the debtor impliedly consents for the creditor to take

reasonable steps to pursue payment even though it may result in actual, though not actionable,

invasion of privacy.") (quoting *Dawson v. Associates Financial Services, Co. of Kansas, Inc.*,

215 Kan. 814, 820, 529 P.2d 104, 110 (1974)).

Regarding whether an intrusion has occurred, other courts have said, "[c]ontext is one of

the several factors which a court considers when evaluating an invasion of privacy claim."

*Bauer v. Ford Motor Credit Co.*, 149 F. Supp. 2d 1106, 1110 (D. Minn. 2001).  Defendants make

their stand on the proposition that only a **physical** invasion of privacy can serve to be an

intrusion for purposes of this tort.  While it is true that this tort owes its inception to cases

involving physical intrusions into a person's privacy, the tort has been expanded significantly

since those early cases.

In this way, the New Mexico case of *Montgomery Ward v. Larragoite*, 81 N.M. 383, 385,

467 P.2d 399 (1970) may be instructive.  In Montgomery, a debtor and his brother were jointly

sued for debt that was incurred by only one of the brothers.  *Id.* at 385.  In deciding the

applicability of an invasion of privacy claim, the court held "[w]e now decide that improper

conduct in knowingly and intentionally pursuing a person to force payment of a debt, whether or

not he owes it, may, under certain circumstances, give rise to a right to damages for an invasion

of privacy."  *Id.*  This rule is especially relevant here, where Defendants were aware of the law

that governs their behavior, acted with reckless disregard of the law in failing to properly

investigate Plaintiff's military status, moving instead for a default judgment relying on false

affidavits, and garnishing Plaintiff's bank account.  This intentional, improper conduct, is the

circumstance envisioned by the New Mexico court, and the issue of whether the debt was rightly owed or not isn't a factor for consideration in the invasion of privacy context.

Ultimately, this Court has recognized that "[a] jury is in the best position to decide what reasonable people consider 'highly offensive.'" *Holland v. GMAC Mortg. Corp.*, No. 03-cv-2666-CM, 2006 WL 1133224, at *14 (D. Kan. Apr. 26, 2006). Although it's true that a debtor can impliedly consent to some reasonable attempts at contact, from a creditor and for purposes of debt collection, Ms. Maxwell did not actually or impliedly consent to "actionable, invasion of privacy." *See Moore v. R.Z. Sims Chevrolet-Subaru, Inc.*, 241 Kan. 542, 549, 738 P.2d 852 (1987); *Dawson v. Associates Financial Services, Co. of Kansas, Inc.*, 215 Kan. 814, 820, 529 p.2d 104 (1974). Consequently, because the more contested element for this claim is one that a jury should consider, this Court should decline granting threshold dismissal on Plaintiff's invasion of privacy claim.[5]

### g. Plaintiff states a claim for outrage

To establish a cause of action for outrage the Plaintiff must show "(1) the conduct of the defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe." *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 280, 662 P.2d 1214 (1983). Claims based on "trivialities or hyperbole" are generally insufficient to establish a claim for outrage under Kansas law. *See Lowe v. Surpas Resource Corp.*, 253 F. Supp. 2d 1209, 1240 (D. Kan. 2003).

Because this matter arises in the debtor-creditor relationship, there is additional guidance

---

[5] Indeed, multiple courts have held that issues of fact regarding offensive debt collection tactics make invasion of privacy claims difficult to resolve as a matter of law. See e.g., Lowe v. Supra Resource Corp., 253 F. Supp. 2d 1209, 1239 (D. Kan. 2003); Joseph v. J.J. Mac Intyre Companies, L.L.C., 238 F. Supp. 2d 1158, 1170 (N.D. Cal. 2002); Bauer v. Ford Motor Credit Co., 149 F. Supp. 2d 1106, 1110 (D. Minn. 2001); Fausto v. Credigy Services Corp., 598 F. Supp. 2d 1049, 1056 (N.D. Cal. 2009).

this Court should be aware of.  "A creditor has and must have the right to take reasonable action to pursue his debtor and collect his debt. But the right to pursue the debtor is not a license to outrage the debtor." *Dawson v. Associates Financial Services Co. of Kansas, Inc.*, 215 Kan. 814, 821, 529 P.2d 104, 110 (1974) (quoting *Norris v. Moskin Stores, Inc.*, 272 Ala. 174, 132 So.2d 321 (1961).  In expanding that principle, the Kansas Supreme Court has held that "[a] creditor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to the debtor is subject to liability for such emotional distress, and if bodily harm to the debtor results from it, for such bodily harm. In a debtor-creditor relationship, the actions of the tort-feasor are compensable when they would be highly offensive to a reasonable man." *Id.* at 822.

Finally, "Before reaching the elements of the claim, the court must, as a matter of law, first determine that reasonable fact finders might differ as to: (1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and (2) whether plaintiff's emotional distress was so extreme and severe that the law must intervene because no reasonable person should be expected to endure it." *Kincaid v. Sturdevant*, 437 F. Supp. 2d 1219, 1226 (D. Kan. 2006).

Here, that Defendant's conduct is so extreme and outrageous is obvious.  "The Servicemembers Civil Relief Act is part of a long record of congressional concern for the domestic affairs of those in military service." *Gordon v. Pete's Auto Service of Denbigh, Inc.*, 637 F.3d 454, 457 (4th Cir. 2011).  Congress's rationale for enacting the SCRA mirrors the admiration and deference felt by Americans for those who wear our nation's uniform and voluntarily place themselves in harm's way, guarding the freedoms enjoyed by this nation's denizens.  To willfully skirt a federal statute designed to protect those to answer our nation's call

is an action that has no place in our society.  Nonetheless "[i]f the court determines . . . that reasonable factfinders might differ as to whether defendant's conduct was sufficiently extreme and outrageous and the plaintiff's emotional distress was genuine and so severe and extreme that it caused injury, then it must be left to the jury to determine liability."  *Kincaid v. Sturdevant*, 437 F. Supp. 2d 1219, 1228 (D. Kan. 2006).

Secondly, Plaintiff has pled that she experienced severe emotional stress and mental anguish, and that the actions of Defendants harmed her reputation and disparaged her character. ECF No. 18 at 18.  She pled that she suffered "anger, anxiety, concentration loss, crying, fear of answering the door, fear of answering the phone, freaking out, embarrassment with family and friends and others, humiliation, marital strife, panic attack, privacy loss, loss of reputation, affecting relationships negatively, sadness, shame, sleep loss, and worry."  ECF No. 18 ¶ 13. These feelings on the backdrop of her being a veteran of the war in Afghanistan, and reasonably concerned about the effects of Defendant's conduct on her undisputedly distinguished time in uniform.  Nonetheless, the issue of whether Plaintiff has experienced the requisite level of emotional distress and mental anguish is an issue for the jury to consider, and this Court should allow her claim for outrage to be considered by a jury.  Thus, Plaintiff's claim for outrage should survive dismissal.

## IV.    Conclusion

Defendant's motion to dismiss the first amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) should be denied.

*Respectfully Submitted*,

*/s/ Bryce B. Bell*
Bryce B. Bell          KS#20866
Bell Law, LLC
2600 Grand Blvd., Suite 580
Kansas City, Missouri 64108
T: 816-886-8206
F: 816-817-8500
Bryce@BellLawKC.com
**ATTORNEY FOR PLAINTIFF**

## <u>CERTIFICATE OF FILING</u>

I hereby certify that the foregoing document was filed electronically with the United States District Court for the District of Kansas on June 30, 2017, which will automatically generate notice of filing to all counsel of record.

*/s/ Bryce B. Bell*
Bryce B. Bell          KS #20866
